IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: : <br> ACCURIDE CORPORATION, *et al.*, <br><br> Debtors. | Chapter 11 <br> Case No. 09-13449-BLS <br> (Jointly Administered) |
| NEW GENERATION ADVISORS, LLC, <br><br> Appellants, <br><br> v. <br><br> ACCURIDE CORPORATION, *et al.*,[1] <br><br> Appellees. | C.A. No. 10-1137-LPS |

## **MEMORANDUM ORDER**

At Wilmington this 30th day of November, 2012, this matter coming before the Court upon the appeal (the "Appeal") (D.I. 1) of New Generation Advisors, LLC ("NGA" or "Appellant"), from an order (the "Order") (Bankr. Case No. 09-13449-BLS, D.I. 1180) and opinion (the "Opinion") (Bankr. D.I. 1179) entered on November 17, 2010 by Bankruptcy Judge Brendan Shannon in the chapter 11 proceedings of Accuride Corporation, *et al.*, denying NGA's Motion to Enforce the Third Amended Joint Plan of Reorganization (the "Motion") (Bankr. D.I. 1121), and having considered the parties' papers submitted in connection therewith;

IT IS ORDERED that the November 17, 2010 Order of the Bankruptcy Court is

---

[1] On October 8, 2009, Accuride Corporation, *et al.* (the "Debtor" or "Appellees") voluntarily commenced their chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (*See* D.I. 1, Opinion, at 2) Pursuant to an order of the Bankruptcy Court dated August 20, 2010 (Bankr. D.I. 1134), the chapter 11 cases of all Debtors other than Accuride Corporation were closed. (*See* D.I. 3 at 1 n.1; D.I. 10 at 1 n.1)

1

AFFIRMED for the reasons that follow.[2]

1.  Relevant Background.[3]  On December 21, 2009, a few months after their bankruptcy filings, the Debtors filed their Third Amended Joint Plan of Reorganization (the "Plan"). (*See* D.I. 1, Opinion, at 2; Bankr. D.I. 448)  On February 18, 2010, the Bankruptcy Court confirmed the Plan, which became effective on February 26, 2010.  (*See* D.I. 1, Opinion, at 2; Bankr. D.I. 856)

2.  At issue here is the Plan's provision for a certain rights offering that entitled a number of holders of subordinated notes issued by the prepetition Debtor (the "Rights Offering Participants") to subscribe to rights offering notes (the "New Notes") up to their allowed claim amount. (*See* D.I. 1, Opinion, at 2; Bankr. D.I. 448, Art. V(H))  "The Plan obligated the Debtor to mail subscription forms to the Rights Offering Participants, and required the Rights Offering Participants to exercise their subscription rights by returning the completed subscription forms to the Debtor." (D.I. 1, Opinion, at 2; *see also* Bankr. D.I. 448, Art. V(H)(3))  While there is no dispute with respect to NGA's purchase as a Rights Offering Participant of a "First Lot" of subordinated notes in the face amount of $5 million, there is disagreement as to whether NGA duly exercised subscription rights regarding a "Second Lot" of notes. (*See* D.I. 1, Opinion, at 2-3)

3.  With respect to this Second Lot, as summarized by the Bankruptcy Court:

---

[2] Given the Court's disposition of the instant matter, NGA's request for oral argument (D.I. 12) is denied as moot.

[3] Because the Court writes primarily for the benefit of the parties, the Court presumes familiarity with the pertinent background facts.

> In January 2010, [NGA] purchased an additional set of subordinated notes in the face amount of $2.5 million (the "Second Lot") held by several funds affiliated with Nomura Corporate Research and Asset Management (collectively, "Nomura"). There is no dispute that Nomura had already subscribed to the New Notes associated with the Second Lot prior to their assignment to [NGA]. To effectuate its subscription to the New Notes associated with the Second Lot, [NGA] submitted to the Debtor the fourteen assignment agreements pursuant to which it acquired its rights in the Second Lot from Nomura. Along with the assignment agreements, [NGA] submitted a signature page that listed the five [NGA] entities to which the Second Lot and the associated New Notes were allocated. However, [NGA] did not provide the Debtor with the actual allocation among these five entities of the Second Lot or the New Notes associated with the Second Lot.
>
> To determine the allocation of the New Notes associated with the Second Lot, the Debtor initiated the correspondence that ensued between it and [NGA]. In response, [NGA] provided the Debtor with an allocation of the face amount of the Second Lot (the "Face Amount") among its five entities, rather than providing the Debtor with an allocation of New Notes based upon [NGA's] allowed claim amount associated with the Second Lot (the "Claim Amount"). Shortly thereafter, the Debtor sent [NGA] confirmation notices using the Face Amount, not the Claim Amount. At no time prior to the Effective Date did [NGA] notify the Debtor of the error (the "Distribution Error")[4] in using the Face Amount instead of the Claim Amount.
>
> In accordance with the Plan and the Court's order confirming the Plan, the Debtor implemented the Plan and consummated the transactions contemplated by the rights offering on or shortly after the Effective Date. On May 11, 2010, [NGA] sent the Debtor a demand letter identifying the Distribution Error
and seeking additional New Notes or equivalent compensation. The Debtor did not meet the demands of [NGA], spurring the Motion and the related pleadings.

(D.I. 1, Opinion, at 2-3)

---

[4]NGA contends it "purchased bond claims totaling $2,646,980 (which corresponded to a face amount of $2,500,000)" and should "have received the correct amount of $1,272,487 in New Notes." (D.I. 8 at 5-6) Instead, "NGA ultimately received only $1,201,829 in New Notes, resulting in a $70,658 shortfall." (*Id.*)

3

4. On July 28, 2010, NGA filed its Motion in the Bankruptcy Court asserting receipt of fewer notes than it had purportedly purchased in connection with the rights offering, and seeking an order enforcing the terms of the Plan and compelling the Debtor to make an additional distribution to NGA; specifically, additional value in either the form of New Notes or an equivalent. (*See* D.I. 1, Opinion, at 4; D.I. 8 at 8; Bankr. D.I. 1121; Bankr. D.I. 1146) The Debtor objected to the Motion, asserting that NGA purchased and received rights offering notes in the exact amounts it had sought and confirmed three separate times. (*See* Bankr. D.I. 1145; D.I. 10 at 1, 4, 6, 10-12, 14) Debtor further asserted it enjoyed immunity from liability under the Plan.

5. On September 23, 2010, the Bankruptcy Court conducted an evidentiary hearing on NGA's request and Debtor's opposition thereto. Then, on November 1, 2010, the Bankruptcy Court heard closing arguments. (*See* D.I. 1, Opinion, at 4; Bankr. D.I. 1121; Bankr. D.I. 1145; Bankr. D.I. 1146; Bankr. D.I. 1153; Bankr. D.I. 1198) In its subsequent Opinion and Order, the Bankruptcy Court denied NGA's Motion. (*See* Bankr. D.I. 1179; Bankr. D.I. 1180)

6. Appellant filed a Notice of Appeal of the Order and Opinion with the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1) on November 29, 2010 (the "Notice of Appeal"). (Bankr. D.I. 1182; *see also* D.I. 4) The Notice of Appeal was entered on the docket of this Court on December 28, 2010. (D.I. 4)

7. <u>Parties' Contentions</u>. In its appeal, NGA asserts that the Bankruptcy Court erred in a number of respects in denying the Motion. Most notably, NGA faults the Bankruptcy Court for concluding that: (i) a chart prepared by Debtor's counsel and never signed by NGA (a) superseded subscription documents that had been submitted by NGA's predecessor-in-interest,

4

Nomura, or (b) modified the Subscription Agreement between NGA and the Debtor; (ii) NGA had intentionally waived its right to receive the full amount of New Notes for which NGA claims subscription; (iii) an oral agreement alleged by the Debtor was not precluded by New York's Statute of Frauds even though the Debtor produced no writing subscribed to by NGA memorializing such oral agreement; (iv) Debtor's failure to deliver the full amount of New Notes for which NGA claims subscription did not constitute a breach of the Subscription Agreement; (v) the burden was on NGA, not the Debtor, to properly calculate the amount of New Notes subscribed for by NGA; and (vi) NGA's subscription submissions failed to comply with the Subscription Agreement. (*See* D.I. 2 at 2; D.I. 8 at 1-2) Accordingly, NGA asks this Court to reverse the Bankruptcy Court's ruling or, in the alternative, to reverse the ruling and remand the case to the Bankruptcy Court for further proceedings. (*See* D.I. 8 at 15)

8. Appellant acknowledges that "[t]he Plan dictates the terms and procedures for Rights Offering Participants to exercise Subscription Rights." (D.I. 11 at 1) Appellant argues, however, that "the Plan provisions governing the exercise of Subscription Rights by Rights Offering Participants do not apply to the Nomura–NGA transaction;" instead, the Assignment Agreement is the operative document. NGA explains that the Assignment Agreement – executed by Nomura as assignor and NGA as assignee, and consented and agreed to by the Debtor – is a binding, stand-alone contract, pursuant to which Nomura assigned to NGA $2,646,980 in bond claims and the right to receive $1,272,487 in New Notes from the Debtor. (*See id.* at 2) Such agreement "unambiguously memorialized NGA's intent to receive the maximum amount of New Notes for which Nomura had subscribed" and, under that agreement, the Debtor was contractually bound to deliver to NGA $1,272,487 in New Notes. (*See id.*) Appellant

5

emphasizes that "NGA did not have to fill out a Subscription Form or Subscription Agreement, because Nomura already had fully and correctly completed that task;" NGA was simply under "no contractual duty to repeat what Nomura already had done." (*Id.*) In sum, "[t]he Assignment Agreement specified the amount of New Notes purchased by NGA. NGA agreed to pay for that amount of New Notes, and the Debtors agreed to deliver them. The terms of the contract never changed." (*Id.* at 10)

9. While NGA identifies myriad issues on appeal, to Appellees "this appeal comes down to a determination of which party bore the burden of submitting appropriate documentation regarding the rights offering, which party bore the burden of curing any defects in such documentation, and which party bore the burden of ensuring that [NGA] ultimately ended up purchasing what [NGA] intended to purchase." (D.I. 10 at 1-2)

10. Appellees contend that the Bankruptcy Court correctly concluded that the Debtor fulfilled its contractual duties to NGA with respect to the distribution of New Notes associated with the Second Lot. (*See* D.I. 10 at 7-12; *see also* D.I. 3) According to Appellees, NGA simply failed to meet *its* burdens. For example, NGA bore the burden of providing Debtor with a submission that would enable the Debtor to distribute notes, but NGA tendered a defective submission. (*See* D.I. 10 at 7-8) Specifically, "[t]he assignment agreements upon which [NGA] bases its claim to the New Notes clearly did not identify which of the five [NGA] entities were to be the assignees for each of the fourteen assignment agreements. Thus, based on the information provided, the Debtors did not know which [NGA] entities were to receive New Notes or the amount of New Notes to be issued to each entity." (*Id.* at 8) Appellees continue: "[h]ad [NGA] correctly completed the fourteen assignment agreements and identified which [NGA] entity was

6

the assignee for each, the Debtors would have issued the New Notes accordingly. Unfortunately, although it could have easily done so, [NGA] did not identify the specific assignee for any of the fourteen assignment agreements . . . [and] [t]his error by [NGA] made it impossible for the Debtors to consummate the transaction." (*Id.* at 13) "The Debtors knew that they could not issue the New Notes to Nomura because an assignment was clearly intended, but, at the same time, they did not know which [NGA] entities were to receive the notes and in what amount." (*Id.*) Appellees emphasize that "[t]he identity of the specific assignees was not a trivial detail because these are all separate legal entities. . . . [W]hile [NGA] tries to characterize the question left open by the defective assignment agreements as merely one of 'allocation,' it is also a question of what legal entity was going to be a party to each of the agreements. . . . [U]ntil the open questions about the identity of the assignees were answered, the Debtors not only could not issue the New Notes as a practical matter, they did not know what legal entity was going to be party to each agreement as a legal matter." (*Id.* at 13-14)

11. Moreover, according to Appellees, it was incumbent upon NGA to cure its defective submission and ensure that it was purchasing what it intended to purchase, yet NGA failed in this regard. (*See id.* at 8-9) While the Debtor notified NGA of the deficiency and met its burden of providing a good faith opportunity to cure under the Plan (*see id.* at 9-12), NGA simply and inappropriately left it to the Debtor to divine NGA's "intent and work out the details to ensure that it purchased what it wanted" (*id.* at 9). The "Plan placed the burden squarely on the rights offering participant . . . to ensure that appropriate subscription information was provided and that the rights offering transaction went forward as intended by the participant. The Debtors' only obligation was to provide a good faith opportunity to cure in the event of a defect

7

in the subscription information provided by the subscribing party. The Bankruptcy Court correctly held that the Debtors satisfied that obligation," and, hence, there was no breach. (*Id.* at 6) Appellees further point to the Bankruptcy Court's conclusion that the clear and unambiguous provisions of the Plan "expressly insulate[] the Debtors from liability associated with the cure process." (*Id.* at 11; *see id.* at 1, 6-7)

12. Appellees further argue that there was no binding contract between any NGA entity and the Debtor until the assignees for the fourteen assignment agreements were identified. (*See* D.I. 10 at 12) Appellees assert that "[a] binding contract could not exist until the defects in this submission were cured through the emails, confirmations and notices upon which the transaction ultimately went forward." (*Id.* at 14) Until such time, then, "there was no contract to be modified." (*Id.* at 15)

13. Finally, Appellees submit that NGA cannot dodge the Plan's terms with assertions that it did not participate in the subscription process. (*See id.* at 15-20) To Appellees, NGA "is seeking to enforce the rights offering provisions of the Plan and it cannot, at the same time, claim that such provisions are inapplicable to it." (*Id.* at 6; *see also id.* at 15-16; Bankr. D.I. 448, Art. V(H))

14. Standard of review. Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" and discretionary jurisdiction to hear appeals "from other interlocutory orders and decrees." 28 U.S.C. § 158(a)(1) and (3). On appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution*

*Corp.*, 197 F.3d 76, 80 (3d Cir. 1999); *see also In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 573 (3d Cir. 2007) ("Our review of the District Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance, because our standard of review is the same as that exercised by the District Court over the decision of the Bankruptcy Court" and, accordingly, "review[ing] the Bankruptcy Court's findings of fact for clear error and exercis[ing] plenary review over questions of law") (internal quotation marks and citations omitted). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

15. A factual finding "is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). "A bankruptcy court's 'ultimate determination of fact' will not be set aside unless 'that determination is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *In re Dr. R.C. Samanta Roy Institute of Sci. Tech. Inc.*, 465 Fed. Appx. 93, 96 (3d Cir. June 15, 2011) (quoting *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995)).

16. <u>Analysis</u>. The Court concludes that the Bankruptcy Court did not err with respect to its findings of fact or legal determinations. It is evident that Judge Shannon thoroughly reviewed the factual record, evaluating it in relation to the positions of the parties and the appropriate authority in light of the circumstances presented. Accordingly, the Court agrees with the Bankruptcy Court's determination that "[NGA] is not entitled to any further distributions of

New Notes or equivalent compensation on account of the Second Lot." (D.I. 1, Opinion, at 10)

17. The Bankruptcy Court appropriately construed the Plan and correctly found that "[NGA] bore the burden of submitting to the Debtor the requisite information in order to actually and validly exercise its subscription rights to the New Notes associated with the Second Lot." (D.I. 1, Opinion, at 7)

18. The Court finds no error in the Bankruptcy Court's determination that "the subscription information that [NGA] initially submitted to the Debtor was insufficient for the Debtor to consummate the rights offering transaction." (D.I. 1, Opinion, at 7) Under the Plan, it is for the Debtor to decide all questions regarding the validity of an attempted exercise of subscription rights – and, here, the Debtor deemed NGA's submission to be inadequate. (*See* D.I. 1, Opinion, at 7-8; *see also* Bankr. D.I. 1153 at 68:11-13 (NGA's witness testifying, "[The Debtor] wouldn't understand which of those particular accounts should get which percentage of that allocation or that subscription of the new notes."); *id.* at 68:14-16 (same witness agreeing Debtor would not be able to issue the notes without additional information))

19. Further, there is no clear error in the Bankruptcy Court's finding that "the burden remained with [NGA] to adequately cure its subscription defect and ensure that the Debtor had and used the correct information to distribute the precise amount in New Notes to which [NGA] intended to subscribe." (D.I. 1, Opinion, at 10) Likewise, the Bankruptcy Court did not err in concluding, "[t]he Debtor discharged its duty to [NGA] under the Plan [by] . . . provid[ing] [NGA] with ample opportunities to cure the initial defect in its . . . submissions." (*Id.* at 9)

20. Additionally, as the Bankruptcy Court correctly observed, pursuant to the Plan the Debtor is immune from liability, as the Plan contains a provision that expressly insulates the

Debtor from liability associated with the cure process. (*See* Bankr. D.I. 448 at 36)  As the

Bankruptcy Court highlighted:

> The Plan further provides "that neither the Debtors nor
> Reorganized Debtors . . . shall incur any liability for giving, or
> failing to give, such notification and opportunity to cure" any
> defects in the subscription forms submitted by New Generation.

(D.I. 1, Opinion, at 10)

Accordingly, the Bankruptcy Court's decision is AFFIRMED and the appeal therefrom is

DENIED.

_____
UNITED STATES DISTRICT JUDGE